**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

NEW JERSEY SECOND AMENDMENT
SOCIETY *et al.*,

                 Plaintiffs,

          v.

NEW JERSEY PRESS ASSOCIATION *et
al.*,

                 Defendants.

Civil Action No. 20-5228 (MAS) (LHG)

**MEMORANDUM OPINION**

**SHIPP, District Judge**

      This matter comes before the Court on Defendants New Jersey Press Association (the "Press Association") and Peggy Stephan Arbitell's ("Arbitell") Motion to Dismiss Plaintiffs New Jersey Second Amendment Society (the "Society") and Alexander Roubian's ("Roubian") Amended Complaint. (ECF No. 55.) Plaintiffs opposed (ECF No. 59), and Defendants replied (ECF No. 62). The Court has carefully considered the parties' submissions and decides the motion without oral argument under Local Civil Rule 78.1. For the reasons set forth below, the Court grants Defendants' Motion.

**I.**      **BACKGROUND**

      This case began as a constitutional showdown between Governor Murphy and the Society, a non-profit corporation that advocates for gun rights. Governor Murphy and the other public defendants (collectively, the "State Defendants"), however, settled their case with the Society. With the Governor tapped out, all that remains is a battle between two non-profit corporations and

their principals: the Society, run by Roubian, and the Press Association, a trade organization of press entities managed by Arbitell. Although the remaining parties continue to toss around lofty terms like "freedom of the press" and "fundamental rights," the facts in this matter are relatively mundane.[1]

### A.    The Government Responds to the Novel Coronavirus.

The story, like so many others over the past year and a half, finds its background in the spread of the novel coronavirus. A serious threat to public health, the World Health Organization declared the coronavirus a public health emergency on January 30, 2020. (Am. Compl. ¶ 15, ECF No. 51.) A flurry of executive orders from Governor Murphy's office ensued. Four days after the declaration, Governor Murphy announced the creation of New Jersey's Coronavirus Taskforce (the "Taskforce"), which coordinated the State's efforts to combat the coronavirus. (*Id.* (citing N.J. Exec. Order 102 (Feb. 3, 2020)).) About a month later, the Governor declared a State of Emergency. (*Id.* ¶ 16 (citing N.J. Exec. Order 103 (Mar. 9, 2020)).) Soon after, the Governor issued Executive Order 104, which limited the hours and operations of non-essential businesses in New Jersey. (*Id.* ¶ 18 (citing N.J. Exec. Order 104 (Mar. 16, 2020)).) As relevant here, that order did not list gun and ammunition retail stores as "essential" businesses—meaning those stores fell under the ambit of the order's business restrictions. (*Id.*) Still another order, Executive Order 107 (which superseded Executive Order 104), mandated the closure of non-essential businesses, including gun and ammunition retail stores. (*Id.* ¶ 20 (citing N.J. Exec. Order 107 (Mar. 21, 2020)).)

Unhappy with Executive Orders 104 and 107, Roubian began attending the Taskforce's "Daily Public Press Briefings." (*Id.* ¶ 19.) Roubian alleges that he "routinely" attended the Daily

---

[1] The Court accepts as true all factual allegations in the Complaint. *See Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2018) (citing *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)).

Public Press Briefings throughout March and raised concerns that the Governor's orders violated the Second Amendment. (*Id.* ¶ 22.) Roubian further alleges that for at least the March 2020 Daily Public Press Briefings, he was able to freely attend and ask questions—without need of any press pass. (*Id.* ¶ 19.)

Roubian also expressed his frustration with the Governor's orders through litigation. On March 23, 2020, the Society and others sued the Governor (the "*Kashinsky* Lawsuit"). The *Kashinsky* Lawsuit alleged that Executive Order 107 amounted to a perpetual ban on the sale of firearms and ammunition and sought to enjoin the State from enforcing the order as applied to gun and ammunition stores. (*See generally* Compl., *Kashinsky v. Murphy*, No. 20-3127 (D.N.J.), ECF No. 1.)[2] A week after the lawsuit's filing, however, the State issued an administrative order that added gun and ammunition stores to the list of essential businesses. (Am. Compl. ¶ 26 (citing Admin. Order, No. 2020-6 (Mar. 30, 2020)).) The Court soon after administratively terminated the *Kashinsky* Lawsuit. (*See* Consent Order, *Kashinsky*, No. 20-3127, ECF No. 28.)

### B.     In 2018, Defendants Deny Plaintiffs Membership and Press Passes.

Against that backdrop, one might wonder what, if anything, Defendants have to do with this case. Roubian alleges two interactions with Defendants that give rise to constitutional concerns. The first—occurring two years before the ravages of the coronavirus and society's acculturation of terms like "social distancing" and "mask mandates"—was Defendants' administrative denial of membership and press credentials to Plaintiffs. Let's break that down.

The Press Association is a non-profit trade organization that brings together news organizations around the State. (Am. Compl. ¶ 5.) It has many members, including newspapers,

---

[2] Defendants also attached the *Kashinsky* Complaint to their Motion. (*See* Cafferty Decl. Ex. A., ECF No. 55-3.)

digital news organizations, and other associate members—the latter category comprising, among others, printing companies, law firms, universities, and advocacy organizations (like the New Jersey Chamber of Commerce). (*Id.* ¶¶ 12-13.) Not just anyone can join the Press Association. To become a member, applicants must fill out forms on the Press Association's website, which mandate certain criteria. For example, newspaper applicants must attach their "most recent newspaper audit," a "postal statement or publisher's sworn statement," and the "last four consecutive issues" of their newspapers. (*See* N.J. Press Ass'n, Newspaper Membership Application.)[3] Applicants joining as digital news organizations or associate members are asked if their organizations promote special interest groups and if they use third-party verification services to measure unique visitors. (*See* N.J. Press Ass'n, Digital News Organization Application; N.J. Press Ass'n, Associate Membership Application.)

Membership in the Press Association bestows several benefits, including the ability to apply for the Press Association's "New Jersey Police Press Credentials" (the "Press Pass"). During 2018, the Press Association issued Press Passes on behalf of the New Jersey State Police ("NJSP"). (*See* Am. Compl. ¶ 9.) According to Defendants, the purpose of the Press Passes is "to aid police officers and other emergency personnel in identifying professional news reporters and photographers having a need for access to police and fire scenes in connection with their professional duties." (Cafferty Decl., Ex. D, ECF No. 55-6.) Further, "[e]ligibility for credentials is limited to news organization employees having regular contact with New Jersey State Police, local police, fire, and EMS personnel." (*Id.*) And, as will become critical later, "[a] New Jersey police credential is not required nor intended for use related to covering municipal, county, or state government meetings." (*Id.*)

---

[3] The Press Association's website is available at http://www.njpa.org/njpa/.

The Press Association employs six criteria in selecting applicants for Press Passes, which are reproduced fully below:

1. Applicants must be employed by **news organizations gathering and disseminating news of general interest** on a regular schedule throughout the year.

2. Police press credentials are:

   1. **NOT required to cover municipal, county or state government meetings or events**

   2. NOT to be used for professional, college or high school sporting events

   3. NOT to be used for entertainment events

3. Applicants must be full-time news reporters or press photographers or freelance/independent contractors.

4. Applications for freelancers and independent contractors require:

   1. Signature of the publisher or senior news editor of the sponsoring news organization

   2. Copies of three (3) stories/photos published by the sponsoring news organization on whose behalf the application is submitted

5. First-time organizations applying for credentials must provide:

   1. If printed, three (3) consecutive issues of the publication

   2. If non-printed, a letter on company letterhead confirming the nature of the organization's news coverage, date established, and other information to help confirm the ongoing news reporting published by the organization.

6. Applications are submitted and credentials issued each year through September 30. Thereafter application forms for the coming year are posted in October and are good through the end of the calendar year.

(*Id.*) Critically, as shown by the sixth criterion above, the Press Association issues Press Passes that are effective for one calendar year. (*Id.*)

5

Why does all this matter? Because Plaintiffs allege that Defendants denied them membership in the Press Association and additionally denied their application for the Press Association's 2018–2019 Press Pass. (Am. Compl. ¶ 10.) According to Plaintiffs, Defendants denied them without ever providing "a specification of reasons for denial or affording a right to appeal the denial." (*Id.*) Regarding Defendants' denial of the Press Pass, Defendants point to a May 2018 e-mail exchange between Roubian and Arbitell. (*See* Cafferty Decl., Ex. D.)[4] There, Arbitell denied Roubian's application for the 2018–2019 Press Pass, stating that "[a]pplicants must be employed by **news organizations** gathering and disseminating news of general interest on a regular schedule throughout the year." (*Id.*) She further mentions that the Press Pass is only for "reporting on breaking news" and, in a subsequent e-mail, that "[Roubian's] organization is a civil advocacy group with a targeted topic/audience and is not considered a **news organization covering <u>news of a general nature</u>**." (*Id.*) In response to Roubian's assertion that government officials used Press Passes for access to non-police events, Arbitell directed Roubian to "work [that] out with them directly" and stated that she "would be happy to speak to those who are denying [Roubian] such access." (*Id.*)

## C.     In 2020, the New Jersey State Police Deny Roubian Access to Governor Murphy's Coronavirus Taskforce Meeting.

Fast forward two years: there lies the second interaction with Defendants alleged by Plaintiffs. Beginning in April 2020, the NJSP began excluding Roubian from the Daily Public Press Briefings. (Am. Compl. ¶ 28.) Plaintiffs allege that NJSP Officers stationed outside the press briefings refused to allow Roubian to enter because he did not have a "Governor's Press Pass" or a Press Pass issued by the Press Association. (*Id.*)

---

[4] Plaintiffs attached this e-mail exchange to their original complaint but did not attach it to the operative Complaint. (*See* Roubian Decl. Ex. C, ECF No. 1-2.)

The events came to a head on April 7, 2020, in a recorded conversation between Roubian and NJSP Sergeant Murray. Plaintiffs allege that Sergeant Murray denied Roubian access to the Daily Public Press Briefing that day, that Arbitell told Sergeant Murray that Roubian "100% was not working with or in any way affiliated with defendant NJPA, nor did he have any form of press credentials she was aware of," and that Arbitell further told Sergeant Murray that "Roubian did not have press credentials, he was NOT 'good to go', and that Roubian should definitely not be admitted to the Governor's daily press briefing as he was not a credible news organization." (Am. Compl. ¶ 29.) A transcript of the events provided by Defendants adds color. (*See* Cafferty Decl., Ex. B, ECF No. 55-4.)[5] Roubian showed Sergeant Murray the May 2018 e-mail exchange and argued that Arbitell's e-mail messages showed that Press Passes were not required. (*Id.*) Sergeant Murray also encouraged Roubian to contact Arbitell. (*Id.*)

**D.      Plaintiffs Sue for Constitutional Violations.**

Following their denial from the Daily Public Press Briefing, Plaintiffs sued the State Defendants and the Press Association. (*See generally* Compl., ECF No. 1.) Plaintiffs sought relief under 42 U.S.C. § 1983, alleging that Defendants had violated their First and Fourteenth Amendment rights. (*Id.* ¶¶ 32-48.) The Press Association moved to dismiss. (ECF No. 32.) In October 2020, the Court dismissed the actions against the State Defendants due to the parties' settlement agreement. (*See* ECF No. 47.) Then in January 2021, the Court granted the Press Association's Motion to Dismiss for failure to state a claim and gave Plaintiffs leave to file the instant Amended Complaint. *See N.J. Second Amend. Soc'y v. Murphy*, No. 20-5228, 2021 WL 323723 (D.N.J. Jan. 31, 2021), ECF No. 48.

---

[5] The Complaint also incorporates by reference a YouTube video of the April 7, 2020 conversation between Sergeant Murray and Roubian. (*See* Am. Compl. ¶ 29 (citing N.J. Second Amend. Soc'y, *Press Denial 3*, YouTube (Apr. 7, 2020), https://www.youtube.com/watch?v=IE0cFy9NXQM).)

Plaintiffs filed their Amended Complaint, dropping the State Defendants and adding Arbitell, where they alleged three constitutional deprivations under § 1983—(1) denial of access to the Daily Public Press Briefings, (2) denial of membership in the Press Association, and (3) denial of the Press Pass. The instant Motion followed.

## II.   **LEGAL STANDARD**

Federal Rule of Civil Procedure 8(a)(2)[6] "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

A district court conducts a three-part analysis when considering a motion to dismiss pursuant to Rule 12(b)(6). *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must accept as true all of the plaintiff's well-pleaded factual allegations and construe the complaint in the light most favorable to the plaintiff. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). The court, however, may ignore legal conclusions or factually unsupported accusations that merely state "the-defendant-unlawfully-harmed-me." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 678). On a Rule 12(b)(6) motion, the "defendant bears the burden of showing that no claim has been

---

[6] All references to a "Rule" or "Rules" hereinafter refer to the Federal Rules of Civil Procedure.

presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

**III.   DISCUSSION**

The Court confronts this case for the second time this year. When the Court first faced this case, it dismissed because Plaintiffs failed to plead how Defendants' denial of a Press Pass in 2018 led to a constitutional deprivation in 2020. *See Murphy*, 2021 WL 323723, ECF No. 48. Not much has changed the second time around. Plaintiffs still plead that the 2018 Press Pass denial was constitutionally infirm—but also that they were wronged by an unspecified denial of membership from the Press Association and by Arbitell's conversations with Sergeant Murray before the April 7, 2020 Daily Public Press Briefing. The Court is not persuaded that these allegations, many of which are conclusory and factually unsupported, fare any better.

**A.    The Court Incorporates by Reference Materials Outside the Amended Complaint.**

Before the Court turns to the adequacy of Plaintiffs' pleadings, it addresses a threshold procedural issue. Defendants request that the Court incorporate by reference the following materials: (1) the Press Association's website, (2) the 2020 criteria for a Press Pass, (3) the May 2018 e-mail exchange between Arbitell and Roubian, (4) the Complaint in the *Kashinsky* Lawsuit, and (5) the video and transcript of the April 7, 2020 conversation between Roubian and Sergeant Murray. (Defs.' Moving Br. 3-4 n.1, ECF No. 55-1.) The Court agrees regarding items (1), (3), and (5).

"As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (citation omitted). But the Court may consider such matters "without converting the motion [to dismiss] into one for summary judgment" when those matters are "*integral to or*

*explicitly relied* upon in the complaint." *Id.* (alteration in original) (citation omitted). And, "[w]here plaintiff has actual notice . . . and has relied upon these documents in framing the complaint," the exception to the general rule is even stronger. *Id.* (alterations in original) (citations omitted). Here, the Court finds good cause to consider the Press Association's website, the May 2018 e-mail exchange, and the video and transcript of the April 7, 2020 conversation between Sergeant Murray and Roubian. Regarding the website, the Amended Complaint quotes directly from the Press Association's website and includes screenshots of the website. (*E.g.*, Am. Compl. ¶ 12.) Regarding the May 2018 e-mail exchange, the exchange details the denial of the Press Pass. It is therefore integral to Plaintiffs' claims because the Amended Complaint repeatedly alleges that Defendants arbitrarily denied the Press Pass to Plaintiffs. (*See, e.g., id.* ¶¶ 10, 14, 38, 44.) Further, the Court notes that Plaintiffs have actual notice of this e-mail exchange because they attached it to their original complaint in this matter. (*See* Roubian Decl. Ex. C, ECF No. 1-2.) Regarding the video and transcript, Plaintiffs expressly reference the April 7, 2020 conversation in their Amended Complaint and do not dispute the veracity of the transcript. (*See* Am. Compl. ¶ 29.) The Court thus incorporates these items by reference and considers them in its decision. *See Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426 ("Plaintiffs cannot prevent a court from looking at the texts of the documents on which [their] claim is based by failing to attach or explicitly cite them.").

**B.      Plaintiffs Fail to Adequately Plead That Defendants Violated the Constitution by Denying Plaintiffs Access to Press Briefings.**

The Court begins its analysis with the charge the Amended Complaint spends the most time addressing: that Defendants violated Plaintiffs' constitutional rights by denying them access to the Daily Public Press Briefings. Plaintiffs maintain several theories of constitutional deprivation: *first*, that Defendants violated Plaintiffs' right to access; *second*, that Defendants retaliated against Plaintiffs in violation of the First Amendment; *third*, that Defendants violated

Plaintiffs' substantive due process right to public access; and *finally*, that Defendants violated Plaintiffs' procedural due process rights by failing to provide means to challenge the denial of access. (*See* Am. Compl. ¶¶ 38, 44.)[7] The Court addresses each theory in turn.

### 1. First Amendment

Before analyzing the details of Plaintiffs' claims, the Court considers what this case is and what it is not. Consider a typical First Amendment retaliation and right-to-access case, which tend to occur in the prison context. Prisoners might allege that prison officials began taking adverse actions against them after the prisoners engaged in activities protected by the First Amendment. For example, prison officials might retaliate against a prisoner for presenting prison grievances by "allowing inmates to assault him, by fabricating incident reports, and by depriving him of personal property." *Deen-Mitchell v. Lappin*, 514 F. App'x 81, 84 (3d Cir. 2013). In addition, the prisoner might allege that prison officials hampered his right to access the courts by, say, preventing his access to the law library or interfering with his outgoing mail to the courts, such that he was unable to effectively use the public court system. *See id.* at 84-85. The takeaway is that retaliation and right-to-access claims are often analyzed separately and have their own set of operative facts.

Now consider this case. Although the Amended Complaint is far from a model of clarity, it appears to allege a right-to-access claim, asserting that Defendants denied Plaintiffs access to the Daily Public Press Briefings in April 2020. (*See* Am. Compl. ¶ 29.) The Amended Complaint also appears to allege a separate claim that Defendants retaliated against them for speaking and

---

[7] The Court notes here that the Amended Complaint does not clearly specify these theories and that Plaintiffs appear to raise many of these theories in their Opposition Brief. Although the Court analyzes all possible theories out of an abundance of caution, it has no obligation to do so. *See Frederico v. Home Depot*, 507 F.3d 188, 202 (3d Cir. 2007) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss." (quoting *Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988))).

accessing the Daily Public Press Briefings by either (a) failing to issue a one-year Press Pass or (b) denying them access to future Daily Public Press Briefings. (*See* Am. Compl. ¶¶ 14, 29.) Unlike the typical case outlined above, the Amended Complaint mixes and matches allegations between the two claims. The result is an unclear timeline and factually unsupported allegations. Nevertheless, the Court wades through Plaintiffs' threadbare pleading in search of anything plausible.

i.       *Right to Access*

The ability to gather news is a constitutionally protected activity. *See Branzburg v. Hayes*, 408 U.S. 665, 681 (1972) ("[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated."); *PG Pub. Co. v. Aichele*, 705 F.3d 91, 98 (3d Cir. 2013) ("[T]he Supreme Court has recognized that the First Amendment—in addition to protecting freedom of speech and the press—must also contain protections for some news-gathering activity." (citation omitted)). But the breadth of that protected activity is limited. As the Supreme Court has noted, "[t]he right to speak and publish does not carry with it the unrestrained right to gather information." *Zemel v. Rusk*, 381 U.S. 1, 17 (1965). And as the Third Circuit has noted, "[W]hile the First Amendment does protect [the press's] right of access to gather news, that right does not extend to *all* information." *PG Pub. Co.*, 705 F.3d at 99; *see also Branzburg*, 408 U.S. at 684 ("[T]he First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally.").

The upshot of this limited news gathering right is that the "First Amendment right to gather news (*i.e.,* the right of access to the source of information or a government process) is best evaluated via a balancing test." *PG Pub. Co.*, 705 F.3d at 102. To be sure, the Third Circuit has held that a trio of Supreme Court decisions stands for a test that balances the "interests of the People in observing and monitoring the functions of their government" against the "government's

interest and/or long-standing historical practice of keeping certain information from public scrutiny." *Id.* at 104. In evaluating those interests, the Court is cognizant of "whether the place and process has historically been open to the press and general public" and "whether public access plays a significant positive role in the functioning of the particular process in question." *Whiteland Woods, L.P. v. Twp. of West Whiteland*, 193 F.3d 177, 181 (3d Cir. 1999) (quoting *Capital Cities Media, Inc. v. Chester*, 797 F.2d 1164, 1174 (3d Cir. 1986)). For example, in *Whiteland Woods*, the Third Circuit held that the First Amendment did not accommodate a request to videotape a government meeting that was open to the public—particularly because the record contained evidence that spectators were already allowed to take notes and use audio recording devices. *Id.* at 183.

All this to say that Plaintiffs must plead sufficient facts for the Court to at least assess whether it can conduct the necessary balancing test. Critical here is that "the value of access must be measured in specifics." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 589 (1980) (plurality) ("Analysis is not advanced by rhetorical statements that all information bears upon public issues; what is crucial in individual cases is whether access to a particular government process is important in terms of that very process."). The Amended Complaint fails to allege these facts. For example, although the first prong of the balancing test calls for assessing the "interests of the People in observing and monitoring the functions of their government," the Amended Complaint does not allege any specific facts about access to the Daily Public Press Briefings. *See PG Pub. Co.*, 705 F.3d at 104. The Amended Complaint broadly alleges that Plaintiffs "were permitted to attend, film, ask questions at and report on the 'Daily Public Press Briefings.'" (Am. Compl. ¶ 19.) But that's it. Aside from Plaintiffs themselves, the Amended Complaint alleges no specific facts about the public's access to the Daily Public Press Briefings—for example, was

anyone from the public allowed to attend? Was anyone excluded? Was the Daily Public Press Briefing televised? The Amended Complaint lacks answers to these threshold questions.

Moreover, the Amended Complaint does not allege facts sufficient for the Court to assess whether access played "a significant positive role in the functioning of" the Taskforce meetings. *Whiteland Woods, L.P.*, 193 F.3d at 181. For example, what role did press questions play in the Taskforce meetings? Were questions often asked? Could anyone at the Taskforce meetings ask questions? The Amended Complaint leaves the Court with more questions than answers, rendering it unable to determine if Plaintiffs have plausibly alleged a right to access under the First Amendment. *See Fowler*, 578 F.3d at 210 (noting that facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged").

Perhaps even more fundamentally, however, Plaintiffs' right-to-access claim must fail because, as pled, it fails to sufficiently connect actions taken by Defendants to the alleged deprivation suffered by Plaintiffs. Plaintiffs suggest that Arbitell's statements to Sergeant Murray served as the basis for Roubian's denial to the Daily Public Press Briefings in April 2020. (*See* Am. Compl. ¶ 29.) But a plain reading of the facts belies Plaintiffs' argument. As Plaintiffs allege, Arbitell told Sergeant Murray that Roubian "100% was not working with or in any way affiliated with defendant NJPA, nor did he have any form of press credentials she was aware of," and that Arbitell further told Sergeant Murray that "Roubian did not have press credentials, he was NOT 'good to go', and that Roubian should definitely not be admitted to the Governor's daily press briefing as he was not a credible news organization." (*Id.*) Everything Arbitell said was factually true: as of 2020, Plaintiffs were not affiliated with the Press Association, did not have press credentials, and could not be admitted to the press briefing because they lacked the required credentials. Further, the Amended Complaint fails to sufficiently allege that Arbitell controlled

Sergeant Murray's actions. To the contrary, the clear inference from the April 7, 2020 interaction between Sergeant Murray and Roubian is that *the State*—not Defendants—decided to use Defendants' Press Passes for access. Simply put, the Amended Complaint does not allege how Defendants deprived Plaintiffs of their right to access.

But maybe Arbitell's statements show a broader intent to arbitrarily change the access policy into the Daily Public Press Briefings to require Press Passes. Indeed, Plaintiffs argue some form of "conspiracy" between Sergeant Murray and Arbitell (*see* Pls.' Opp'n Br. 16-17), and the Amended Complaint alleges that Press Passes were not required to access the Daily Public Press Briefings in March 2020 (*see* Am. Compl. ¶ 19). But if Arbitell really was involved in the policy to arbitrarily deny Roubian access, again the Amended Complaint suffers from a failure of pleading. The Amended Complaint nowhere alleges that Defendants were aware of the policy change or had any hand in crafting the policy change. It does not allege that Press Passes were the exclusive method of entry into the Daily Public Press Briefings—indeed Plaintiffs allege that the "Governor's Press Pass" was also acceptable. (Am. Compl. ¶ 28.) Nor does it allege that Plaintiffs attempted to comply with the policy.[8] And, to the extent Plaintiffs plead a conspiracy claim between Sergeant Murray and Arbitell, that claim is plainly deficient. *See Fioriglio v. City of Atlantic City*, 996 F. Supp. 379, 385 (D.N.J. 1998) ("To make out a § 1983 conspiracy claim, the plaintiff must *make specific factual allegations* of a combination, agreement, or understanding among all or between any of the defendants to plot, plan, or conspire to carry out the alleged chain of events in order to deprive plaintiff of a federally protected right." (emphasis added) (citations omitted)).

---

[8] Indeed, Plaintiffs did not even apply for the Press Pass—good for only one year—for the 2020–2021 year.

ii.      *Retaliation*

To state a claim for First Amendment retaliation under § 1983, Plaintiffs must allege that: (1) "they engaged in a protected activity"; (2) the "defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights"; and (3) "there was a causal connection between the protected activity and the retaliatory action." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007) (citations omitted). For each element, the Amended Complaint is fraught with a failure of pleading.

Start with the first element, a "protected activity." "Whether an individual has engaged in protected conduct is a question of law." *White v. Wetzel*, No. 14-1552, 2016 WL 3197966, at *6 (W.D. Pa. June 9, 2016). The Amended Complaint does not clearly define the protected activity. Maybe it's the access to the Daily Public Press Briefings? But as stated above, Plaintiffs have not adequately alleged a right to access the Daily Public Press Briefings. Maybe then the protected activity is the filing of the *Kashinsky* Lawsuit? That timing makes sense because the Society filed the *Kashinsky* Lawsuit on March 23, 2020, and was subsequently excluded from the Daily Public Press Briefings in April 2020. But the Amended Complaint fails to allege that Defendants were aware of the *Kashinsky* Lawsuit. Indeed, Defendants were not named in that lawsuit. So maybe instead the protected activity is Plaintiffs' speech advocating for the Second Amendment? The Amended Complaint alleges that Roubian "asked questions and argued that the Second Amendment mandated that Gun and Ammunition Stores be declared as 'Essential Businesses'" at the March Daily Public Press Briefings. (Am. Compl. ¶ 22.) But again, the Amended Complaint does not allege that Defendants were aware of this speech or allege any facts substantiating that Defendants harbored retaliatory animus against Plaintiffs. (*See* Am. Compl. ¶ 14 (conclusorily alleging that Defendants "disagree[d] with the political views" of Plaintiffs"); *Iqbal*, 556 U.S. at 680.) In short, Plaintiffs do not identify what protected activity Defendants retaliated against.

Regarding the second element, Plaintiffs also fail to identify any concrete act of retaliation. Here, Plaintiffs suffer from a common-sense timing problem: retaliatory acts must *follow* a protected activity. *E.g.*, *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (evaluating claim for retaliatory discharge by noting that discharge came two days *after* protected activity). The Amended Complaint does not allege any retaliatory action taken by Defendants following the Daily Public Press Briefings. *See White*, 2016 WL 3197966, at *7 ("The amended complaint is simply bereft of any allegations that [p]laintiff engaged in any form of constitutionally protected speech or conduct *prior to being issued the misconduct*." (emphasis added)). Here again, the Court finds it helpful to consider the typical retaliation case outlined above. The pleadings should lay out a clear exercise of protected activity (such as prison grievance reporting) followed by a clear exercise of retaliation (such as prison officials allowing inmates to assault the plaintiff). That is not what Plaintiffs plead here. As evidence of retaliation, Plaintiffs point to paragraph 14 of the Amended Complaint, which provides that "[b]ecause of [Defendants'] disagreement with the political views of [Plaintiffs], such plaintiffs have been arbitrarily denied both Membership in defendant NJPA and denied 'NJPA New Jersey State Police Press Credentials.'" (Am. Compl. ¶ 14.) Plaintiffs appear to posit that Defendants retaliated against Plaintiffs' protected activity *in 2020* by denying them a Press Pass *in 2018*. Simple logic defeats Plaintiffs' fatally flawed pleading.

Finally, for the same reasons as above, the Amended Complaint fails to connect Defendants' purported retaliation to Plaintiffs' expression of protected activity. The Court has already addressed the temporal problem. But consider that, even if withholding the Press Pass could serve as actionable retaliation, by its terms, it has virtually nothing to do with the Daily Public Press Briefings or the type of news Plaintiffs purport to report. According to the May 2018

e-mail exchange between Arbitell and Roubian, Press Passes are for applicants "employed by **news organizations** gathering and disseminating news of general interest on a regular schedule throughout the year." (Cafferty Decl., Ex. D.) The e-mail exchange further states that "[e]ligibility for credentials is limited to news organization employees having regular contact with New Jersey State Police, local police, fire, and EMS personnel." (*Id.*) And critically, "[a] New Jersey police credential is not required nor intended for use related to covering municipal, county, or state government meetings." (*Id.*) All of this to say, the Press Pass is only tenuously related to the events of this case. The Amended Complaint does not allege, for example, that the Society reports on "news of general interest," publishes regularly, or has regular contact with NJSP. (*See id.*) And it does not sufficiently allege how the Press Pass mattered given that it was not necessary for "state government meetings." (*See id.*) Perhaps the Press Pass would matter more if the State Defendants were still in the case. But Plaintiffs cannot maintain a retaliation claim against Defendants who had virtually nothing to do with Plaintiffs' exclusion from the Daily Public Press Briefings.

### 2. Fourteenth Amendment

The Court next turns to Plaintiffs' claims under the Fourteenth Amendment. None are actionable.

#### i. *Substantive Due Process*

Plaintiffs assert that they have a liberty interest in attending press briefings and that Defendants infringed on that liberty interest. (*See* Am. Compl. ¶¶ 42-43 ("Plaintiffs' First Amendment rights undoubtedly qualify as a 'liberty interest' within the meaning of the Section 1 of the Fourteenth Amendment . . . .").) Notably, Plaintiffs do not defend this theory in their Opposition Brief and cite no law in support of their "liberty interest" theory. It's easy to see why: the Supreme Court has stated that substantive due process applies only to "the most egregious official conduct." *See County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). To that end,

"[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Id.* at 842 (alteration in original) (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion)). Here, Plaintiffs' pleadings come nowhere close to alleging the most egregious official conduct. And even if they had, the substantive due process claim must fail because the Constitution provides "explicit textual source[s]" for protection through the First Amendment and the Fourteenth Amendment's procedural due process clause. *See Nicholas v. Bratton*, 376 F. Supp. 3d 232, 287 (S.D.N.Y. 2019).[9]

### ii.    *Procedural Due Process*

Plaintiffs additionally assert a procedural due process claim under the Fourteenth Amendment. The crux of Plaintiffs' claim is that "Plaintiff Roubian was not afforded a meaningful opportunity to challenge rejection of . . . his refusal of admission Officer Murray [sic] – who was acting at the direction of defendant Arbitell." (Pls.' Opp'n Br. 19.) Claims for procedural due process violations require plaintiffs to allege that (1) they were "deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,'" and (2) that "the procedures available to [them] did not provide 'due process of law.'" *Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006) (quoting *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)). Unlike claims under substantive due process, claims under procedural due process can be enforced directly through the Constitution's textual rights. *See Gitlow v. New York*, 268 U.S. 652, 666 (1925) ("[F]reedom of speech and of the press . . . are among the fundamental

---

[9] To the extent Plaintiffs raise a substantive due process claim regarding membership in the Press Association and denial of the Press Pass, the Court similarly denies those claims.

personal rights and 'liberties' protected by the due process clause of the Fourteenth Amendment from impairment by the States."). Thus, in analyzing the right to access, courts have repeatedly held that "the protection afforded newsgathering under the first amendment guarantee of freedom of the press requires that this access not be denied arbitrarily or for less than compelling reasons." *Sherrill v. Knight*, 569 F.2d 124, 129 (D.C. Cir. 1977).

So, to assess Plaintiffs' procedural due process claim, the Court must answer whether Plaintiffs have sufficiently pled that Defendants denied them access to the Daily Public Press Briefings and that Defendants acted arbitrarily in denying them such access. The Court has already answered, however, that Plaintiffs have not sufficiently pled that Defendants denied them access to the Daily Public Press Briefings. And further, the Amended Complaint does not contain any allegations about Defendants' role in crafting the procedure that ultimately resulted in the denial of Roubian from the April 7, 2020 Daily Public Press Briefing. Plaintiffs assert that "the process was Officer Murray called defendant Arbitell, and she said 'NO.'" (Pls.' Opp'n Br. 20.) But that is not supported by the events on April 7, 2020—the State denied Roubian access, and Defendants told the State, truthfully, that Plaintiffs did not have Press Passes and therefore could not be admitted to the Daily Public Press Briefing on that basis. Indeed, the Amended Complaint does not substantiate its threadbare allegation that Arbitell controlled Sergeant Murray's actions. Simply put, Plaintiffs' gripe is with *the State's* procedure, not Defendants'. Plaintiffs' procedural due process claim must fail.

### C. Plaintiffs Fail to Adequately Plead that Defendants Violated the Constitution by Denying Plaintiffs Membership and Press Passes.

Having determined that Plaintiffs cannot maintain actionable claims for events relating to the Daily Public Press Briefings, the Court next turns to whether Defendants' denial of membership in the Press Association and denial of Press Passes are constitutional violations. As a

threshold matter, the Amended Complaint alleges no facts supporting Plaintiffs' membership-denial theory. For example, the Amended Complaint does not allege that Plaintiffs attempted to become members in the Press Association, when they did so, what the procedure for doing so was, or whether Defendants provided any justifications for Plaintiffs' denial. Further, Plaintiffs point the Court to no authority supporting any First or Fourteenth Amendment right to membership in a private press organization. The Court, therefore, dismisses all claims regarding Defendants' purported denial of Plaintiffs' membership in the Press Association.

The Court turns to whether Defendants' denial of a Press Pass is constitutionally infirm.

### 1.    First Amendment

Plaintiffs allege that Defendants retaliated against their political views by denying Roubian a Press Pass. On its face, this seems like a straightforward theory. The problem, however, is that Plaintiffs fail to plead it adequately. The Amended Complaint contains no references to Plaintiffs' pre-denial political speech to Defendants. Nor does it contain any allegations to Defendants' awareness of that political speech. Thus, even if the Court considered Defendants' denial of the Press Pass retaliatory, the Amended Complaint contains wholly insufficient allegations of any protected activity or a causal link between Plaintiffs' speech and Defendants' conduct. Because the Court will give Plaintiffs one final opportunity to amend this claim, Plaintiffs must, at minimum, allege the following: (1) clear statements of protected activity that occurred *before* the alleged retaliation; (2) allegations that those statements were made to or known by Defendants *before* the alleged retaliation; and (3) allegations explaining how Plaintiffs' protected activity caused the Press Pass denial. Only then will the Court be able to evaluate the plausibility of Plaintiffs' First Amendment retaliation claim.

2.      **Fourteenth Amendment**

Turning finally to the Fourteenth Amendment, Plaintiff maintains procedural due process and equal protection claims against Defendants for the Press Pass denial.

i.      *Procedural Due Process*

Regarding procedural due process, Plaintiffs assert that "Plaintiff Roubian was not afforded a meaningful opportunity to challenge rejection of . . . an application for 'New Jersey State Police Press Credentials.'" (Pls.' Opp'n Br. 19.) This is a weightier charge than Plaintiffs' other procedural due process claim. As stated above, claims for procedural due process violations require plaintiffs to allege that (1) they were "deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,'" and (2) that "the procedures available to [them] did not provide 'due process of law.'" *Hill*, 455 F.3d at 233-34.

The Court's review of Third Circuit precedent reveals no case clearly articulating a due process interest in the Press Pass. At least one other circuit, however, has provided helpful guidance. In *Sherrill v. Knight*, the District of Columbia Circuit grappled with the Secret Service's denial of a reporter's White House press pass. 569 F.2d at 126-27. In assessing the reporter's subsequent procedural due process claim, the D.C. Circuit held that "the interest of a bona fide Washington correspondent in obtaining a White House press pass is protected by the [F]irst [A]mendment," and that this "[F]irst [A]mendment interest undoubtedly qualifies as [a] liberty which may not be denied without due process of law." *Id.* at 130. Subsequent courts continue to cite *Sherrill* favorably. *See Karem v. Trump*, 404 F. Supp. 3d 203, 205 (D.D.C. 2019) ("In light of that decision to make White House press facilities widely accessible, the D.C. Circuit has held that reporters have a First Amendment liberty interest in possessing a long-term so-called 'hard pass'—an interest that, under the Fifth Amendment, may not be deprived without due process." (citing *Sherrill*, 569 F.2d at 130)); Tr. of Mot. Hr'g at 13, *Cable News Network, Inc. v. Trump*, No.

18-2610, 2018 WL 9436958 (D.D.C. Nov. 16, 2018), ECF No. 22 ("[I]f *Sherrill* stands for anything at all, I think it's unavoidable to . . . conclude anything other than it stands for the Fifth Amendment's due process clause protects a reporter's First Amendment liberty interest in a White House press pass."); *Huminski v. Corsones*, 396 F.3d 53, 84 (2d Cir. 2005); *Nicholas*, 376 F. Supp. 3d at 280. The Court thus assumes, without deciding, that the principles announced in *Sherrill* apply to Plaintiffs' procedural due process claim.

Regarding the second prong—due process of law—"procedural due process requires notice and an opportunity to be heard." *Mancini v. Northampton County*, 836 F.3d 308, 315 (3d Cir. 2016) (citing *Mathews v. Eldridge*, 424 U.S. 319, 333, 348 (1976)). The Third Circuit has cautioned, however, that the concepts of notice and opportunities to be heard are "flexible" and "call[] for procedural protection as dictated by the particular circumstance." *Kahn v. United States*, 753 F.2d 1208, 1218 (3d Cir. 1985) (citing *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). In any event, courts evaluating the sufficiency of process weigh three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Dee v. Borough of Dunmore*, 549 F.3d 225, 232 (3d Cir. 2008) (quoting *Mathews*, 424 U.S. at 335).

Against this backdrop, the Court evaluates the sufficiency of Plaintiffs' pleadings regarding the denial of the Press Pass. Under the first prong, the Court finds that, under *Sherrill*, the liberty interest attaches where the reporters are, at minimum, bona fide journalists. 569 F.2d at 129-30 ("Given these important first amendment rights implicated by refusal to grant White House press passes to *bona fide Washington journalists*, such refusal must be based on a compelling

governmental interest." (emphasis added)). In describing the contours of a bona fide journalist, the D.C. Circuit noted that the journalist was "the Washington Correspondent for The Nation since 1965" and that White House press pass applicants were "required to have a pass to the House and Senate galleries because this verifies the 'professional credentials' of the applicant." *Id.* at 126, 129 n.19. Thus, for the liberty interest to attach, Plaintiffs must allege some indicia that they are bona fide journalists.

The Amended Complaint fails to meet that challenge. It alleges that the Society is a "non-profit civil rights organization" that has at least one employee, Roubian. (Am. Compl. ¶ 7.) Roubian is "one of the reporters" and operator of the Society's website, which reports on "the most up to date and relevant information regarding New Jersey State and Local Governments and the Second Amendment." (*Id.* ¶ 8.) What's missing though are allegations of indicia to help the Court determine whether Plaintiffs are bona fide journalists. How many reporters does the Society employ? Do Plaintiffs have other press credentials? How often do Plaintiffs publish? What do Plaintiffs publish? The Court further notes that, although it is clear why a Washington-based political correspondent in Washington, D.C., required a White House press pass, it is less clear why a civil rights organization requires a Press Pass to access emergency crime scenes. Thus, the Amended Complaint additionally fails to allege the relevance of the Press Pass to Plaintiffs' journalistic interests. The Court finds these missing allegations critical, especially considering the ease with which any citizen could digitally publish on some matter and then claim entitlement to a Press Pass. The Court additionally notes here that its review of press pass cases has turned up cases that consider established journalists, unlike Plaintiffs here (at least as alleged). *See, e.g.,* *Sherrill*, 569 F.2d at 126 (established political correspondent); *Karem*, 404 F. Supp. 3d at 205-06 (same); Tr. of Mot. Hr'g, *Cable News Network, Inc.*, No. 18-2610, 2018 WL 9436958 (same);

*Nicholas*, 376 F. Supp. 3d at 242 (freelance photojournalist working for media outlets); *Quad-City Comm. News Serv., Inc. v. Jebens*, 334 F. Supp. 8, 10 (S.D. Iowa 1971) (non-profit "underground" newspaper).

Even stronger though, the Amended Complaint fails to allege that Defendants deprived Plaintiffs of sufficient process. Plaintiffs assert that "there was not a reasonable assessment of whether he met the criteria, and he was not provided with the required 'factual basis for denial with an opportunity to rebut.'" (Pls.' Opp'n Br. 19 (alteration omitted) (quoting *Sherrill*, 569 F.2d at 131).) The Court disagrees. Under *Sherrill*, agencies denying press passes "must publish or otherwise make publicly known the actual standard employed in determining whether an otherwise eligible journalist will obtain a . . . press pass" and must give "notice to the unsuccessful applicant of the factual bases for denial with an opportunity to rebut." 569 F.2d at 130-31. Plaintiffs have not alleged that Defendants failed to meet this standard. In a detailed e-mail exchange, Arbitell provided Roubian with the six criteria that all applicants for Press Passes must meet. (Cafferty Decl., Ex. D.) She then informed Roubian that "[a]pplicants must be employed by **news organizations** gathering and disseminating news of general interest on a regular schedule throughout the year." (*Id.*) She further noted that the Press Pass is only for "reporting on breaking news" and that "your organization is a civil advocacy group with a targeted topic/audience and is not considered a **news organization covering news of a general nature**." (*Id.*) In addition, the May 2018 e-mail exchange shows that Arbitell directed Roubian to appeal directly to those denying him access and that she "would be happy to speak to those who are denying you such access." (*Id.*) The Amended Complaint does not allege that Roubian ever followed up with Arbitell or that he was denied access to a government event for the 2018–2019 year. Especially without

more specific allegations showing some denial of process, the Court finds this procedural due process claim insufficiently pled.

ii.     *Equal Protection Clause*

Plaintiffs pen all of two paragraphs in their Opposition Brief in support of their Equal Protection Clause claim. (*See* Pls.' Opp'n Br. 20.) In essence, Plaintiffs assert that under a "class of one" equal protection claim, "[P]laintiffs alleges [sic] that the NJPA . . . issued 'NJPA New Jersey State Police Press Credentials' to a host of others." (*Id.* at 20.) The Court disposes of this claim easily. To allege a "class of one" equal protection claim, Plaintiffs must allege that (1) they have "been intentionally treated differently from others similarly situated," and that (2) "there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000). The Amended Complaint contains no allegations of Defendants' intentional conduct. It broadly alleges that all members in the Press Association have been issued Press Passes (*see* Am. Compl. ¶ 13), but the Press Association's website plainly shows that applying for membership and applying for Press Passes are two separate procedures. Moreover, even if the Amended Complaint had alleged intentional discrimination, it alleges nothing overcoming the rational basis for the Press Pass denial, as articulated in the May 2018 e-mail exchange. This Court finds this claim insufficiently pled.

IV.     **CONCLUSION**

The Court holds that Plaintiffs' Amended Complaint is insufficiently pled. It further finds that amendment would be futile for the following claims and therefore dismisses with prejudice: (1) Plaintiffs' retaliation claim related to the Daily Public Press Briefings, (2) Plaintiffs' substantive due process claim, and (3) all claims related to Plaintiffs' denial of Press Association membership. *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002) (noting that court has discretion to dismiss claims with prejudice when finding amendment would be futile

(citing *Foman v. Davis*, 371 U.S. 178, 182 (1962))). Specifically, regarding Plaintiffs' retaliation claim, the Court finds amendment futile because Plaintiffs have twice failed to allege any *post*-access retaliation. Regarding Plaintiffs' substantive due process claim, the Court finds amendment futile because Plaintiffs already bring First Amendment and procedural due process claims. Regarding Plaintiffs' membership-denial theory, the Court finds amendment futile because Plaintiffs have twice failed to allege any specific facts supporting their theory. The Court dismisses without prejudice the remaining claims.[10]

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

---

[10] One note of caution for Plaintiffs. Although the Court does not address today whether Defendants are state actors, that is a necessary ingredient for Plaintiffs' § 1983 claims. Should they amend, the Court advises Plaintiffs to sufficiently and non-conclusorily allege how Defendants are state actors.